BY THE COURT.
Our law makes the coroner’s inquest thefoundation for an arrest of the accused, and for recognizing the witnesses to appear at court; it does not make the verdict evidence against the accused on his trial. Ruled out.
The following narrative is drawn from the testimony of the witnesses examined in the cause:
The deceased had resided in the county about twenty years; he had a wife, two or three adult daughters, and other children. He was intemperate, and when warmed with spirits, was wild, noisy, disposed to yell loud enough to be heard at a great distance. When intoxicated, he frequently quarrelled with hrs wife and family.
The prisoner was a brother of the deceased, formerly resided in Loudon or Fauquier county in Virginia, where he had a wife and nine children, who are all said to be dead. About a year before the death of his brother, he came into the county, stopped at the house of a brother-in-law of the deceased, drank freely, then said he was an officer where he came from — took down a regimental coat and sword, put them on, and started to see his brother. On the way he broke out as if preaching, and while he was preaching, his brother came up and offered to shake hands with him; they had not met for eighteen or twenty years. The prisoner refused to shake hands, saying is it possible I have come so far and find you m such a situation? After a short time, the party went to the house of the deceased. Angry 22] words passed there between the brothers about *some leased land in Virginia, then depending upon the life of the .deceased. This lease the prisoner had sold, and the deceased complained that he had been cheated out of several hundred dollars. The prisoner replied, don’t say so, or I will cut your head off: — and added, I came out on purpose to kill you, and I will kill you yet, for you live in a very bad way. He had his sword drawn. Soon after, the prisoner left; but, the next morning, returned; was then pretty sober. They met friendly, and he continued from that time to reside with the deceased during his life. Both were frequently intoxicated, and often quarrelled about the Virginia property. Some talk arose about the prisoner’s conduct with the wife and some of the daughters of the deceased. They once or twice threatened each other — one with a raised stool *23 or club, the other with a knife; and the deceased once told the prisoner if he did not behave better he must leave the house. The brothers were frequently drunk, and each sometimes staid out all night. The deceased sometimes fell and bruised himself when drunk. On one occasion he was gone three or four days, and his wife found him at a still house, and brought him home. The prisoner was in the habit of preaching or ranting in a loud tone, in the woods and other places when intoxicated. On Friday morning before Samuel Turner’s death, the prisoner left home, saying, be would go to Chambers’. The brothers had been sober for some time, without quarrelling. The prisoner was at Chambers’ nearly all day on Friday in a frolic — had a knife — he left there and went towards home. The deceased left home in the afternoon with his neighbor Chambers, and said they, were going to the still house. They were at the still house before sundown. The prisoner came there about fifteen minutes after them. Chambers borrowed a coffee pot, and had it filled with whisky. He drank of it, and offered it to the deceased, when the prisoner said, don’t you drink any of that, if you do you won’t live till morning — -you are dying now, if you did but know it. The deceased made little or no reply, but seemed serious. They both drank, and soon left the still house, not much intoxicated. The deceased and Chambers left first. After they had gone about twenty rods, the prisoner followed. The three were at Chambers’ house just before dark, with the coffee pot of whisky, and sat down at the door. The brothers fell into angry discourse, said something about Betsey Turner and another woman, and quarrelled; the deceased raising the coulter of a plough, and the prisoner the ploughshare' — -the deceased said, if you will lay down your weapon I will mine; they were laid aside. Afterwards, the prisoner had his knife out, and the deceased said to *him, Jim, lay away your knife, for I got one myself the other [23 day. The deceased shortly after put his arms round the prisoner’s neck, and said there was no harm done. They then took a dram, and the brothers started together, after dark, towards home.
The night was still, and several persons living about half a mile from the place where the body was found, sometime after darkheard violent outcries once or twice. Two female witnesses, who were out from home, described the noise as a very curious one, like a warning, choking, and strangling, an unnatural moaning. They supposed it the Turners, as they knew they had whisky at Chambers’, and the noise was on their route home. The body of the deceased was found in the same direction of the noise. Talking, like that of a person preaching, was heard several times in the course of the *24 night, in the woods. It would continue for a short time, cease, and then break out again in some other place. Loud talking was heard, of more than one voice, about fifteen minutes before the moaning noise. The first preaching noise was heard at Chambers’, appeared beyond where the body was found, and near the still house. A short time after the first preaching noise was heard, the prisoner returned to Chambers’ and wanted to come in ; but was refused and driven off. He went then in an opposite direction to that where the body was found.
Before the sun rose on Saturday morning, the prisoner came again to Chambers’, and said he had lain on the fodder in the shed near the house. Chambers and the prisoner soon went away together, saying they were going to the still house. After breakfast, the prisoner came back without Chambers. Two of Chambers’ daughters and a little son of the deceased, were near the door when he approached, and first saw him near where the body -was found. When he came up he asked his nephew if his father had got home? The boy replied no. Do you know where he is? No. Have you heard from him? No. When these questions and answers had passed, one of the girls discovered blood on both legs of the prisoner’s pantaloons, generally sprinkled, but in one place in stripes, as if a knife blade had been wiped on it, and asked him, how came that blood on your pantaloons? He replied, it is none of your business: but, after a pause, he said, I killed your father for his money. He paused again, and then added, O no, I did not. He then ordered the girls to catch a chicken and get breakfast, as if their father had told him so; but soon became rough and boisterous. He chased the girls, and swore he would kill them. They thought he was partly in fun. Chambers came home and ordered him off. 24] He refused to go, and *they quarrelled and raised clubs, and was not sent away until the dogs were called and set upon him.
About noon, on the same day, the prisoner was at his brother’s house, intoxicated. Mrs. Turner asked where Samuel was? He said, he did not know where he was, he had not seen him, she knew as well as he did: but afterwards he said, Sam went out of Chambers’ gate, and he did not know where he went to. The prisoner staid about Turner’s house all day: was drunk enough to preach, as liquor usually affected him, but was still. He lay down and slept some. The family left the house, went to Mrs. Turner’s mother’s, and staid there all night. After this, he was at Pinkestock’s, and was asked to stay there all night, but refused. On Sunday morning, when Turner's family returned, the prisoner was at the house, and pretty *25 sober. Mrs. Turner wondered where her husband was? He replied, he reckoned he was in some place intoxicated. Was again asked where the deceased went? and replied, he did not know, but supposed he was in some still house, drunk. He went away, saying, he would go and hunt up his brother. On his return he said he had been to the mill, the still house, and several other places, but could find nothing of him. He was asked where he had lain on Saturday night, but made no reply. He went a second time to search for his brother, and was absent nearly all day. In the evening he went to Mrs. Turner’s mother’s and told a daughter that her mother was sick, and that her father had not come home from his frolic. He left there under pretence of hunting for his brother. He was at Chambers’ during the day, intoxicated, noisy and quarrelsome. During the day, he told Mrs. Turner he had staid part of the night before at Pinkestoek’s, and part of the time in the forest.
On Monday morning, about daybreak, the defendant came home and asked if his brother had returned ? On being answered in the negative, he staid a short time, and went away, saying he would go to Chambers’ to plough. He was pretty sober — went to Chambers’, but he would not let him work, because he had behaved so bad on Saturday and Sunday. He said at Chambers’, that his brother had not yet returned, and went away in a short time. He was again at his home, at Turner’s, towards night, pretty drunk, and said he had not seen or- heard of the deceased since he left Chambers’, on Friday night. In the afternoon, the witnesses described him as appearing uneasy — unable to keep quiet. He walked back and forth sometimes — sometimes he would stand still for a time, and look towards the place where the body was found, and express his wonder that his brother did not come home.
*On Tuesday morning, Clark, a neighbor of Turner’s, calledin, [25 and expressed his conviction that the deceased must have been killed. The prisoner’s appearance, or expression, when this was said, was not noticed. In a short time, Clark and the prisoner left the house together, to hunt for the deceased. On their return, he said they could find nothing. During all this time, none other of the family made any search for the deceased. The neighbors became alarmed on Tuesday, and made search, and about 2 P. M. found the body. A man went up to Turner’s house, and informed the family —the prisoner was present when he came. When informed that the body was found, nothing particular was noticed in his manner. He asked where he was found, and went off in the direction of the body, in a short time, without making any remark. The family v?ent down to the place afterwards.
*26 The body was found on a hill side, some distance from the main road, in a little piece of woods, about two hundred yard»s froni Chambers’ dwelling house, near a foot-path leading to it, and near the route the Turners usually took in going home from Chambers’. The body, when found, was lying on its right side, the head inclined forward and down the hill. The legs drawn up; one arm under the body; the other lying upon it. The hat was on the upper side of the head, pressed into the shirt collar, and covering up the side of the head, as if placed there after the body was laid down. The collar of the shirt was open, and the neck without a cravat. The body had lain a considerable time, had become putrid in places, and such spots were covered with worms. When the head was turned, the wound in the neck was discovered, and it gaped open. The lips of the wound were a little ragged, but when the putrid flesh and worms were scraped off, the surface of the flesh was smooth, as if cut in by a sharp instrument. There were cream colored strands, about the size of a straw, each side of the wound in the neck, which appeared to have been cut in two. The examining surgeons said these were arteries. The cut in the throat seemed to begin on the left side, near the ear. It passed the windpipe, without cutting through it, laid it bare, and then abruptly sunk deep in on the right side of the neck. The witnesses thought the jugular vein was cut. There was blood upon the shirt collar, and upon the ground, below where the body lay, discovered by digging open the ground with a stick. A heavy rain had fallen two nights before the body was found. There was a bruise on the forehead, and one on the breast. No weapon of any kind was found upon, or near the body. One or two loose stones were lying near where the body lay. The ground 26] *was depressed, or sunk in, where the head and shoulders lay. The surgeons who examined the body had left the country, and were not in court to testify.
The prisoner went down to the place w'here the body was, but seemed indifferent. He neither went forward to examine the body, nor did he examine the ground about it, or ask any questions. He had with him a common knife. The spots like blood were still noticed upon the legs of his pantaloons. When interrogated about his brother, he sometimes, for a few minutes, seemed affected, and trembled; but at other times, he appeared careless and indifferent. Young Chambers accused him of the murder: he replied, he was innocent. At one of the times when he trembled violently, he was asked, what is the matter? what affects you so much? He replied, no wonder, when folks accuse me of killing my brother. The stains *27 ■on Ms pantaloons were pointed out to Mm, and he was asked how they came? He said, they were stained with fruit. The stains then appeared as with blood, and to have been wet afterwards and worn. A respectable person of the neighborhood told the prisoner that if he could recollect and show where he was about three-quaters of an hour, he might remove suspicion from him. He replied, that he was innocent, and knew nothing about it. The person told him again, he had better explain fully, and took pains to make him understand. He answered as before. Some time after this, in the night, he called the same person aside, and said to him, I think lean tell you now in what way Sam was killed. Alex. Chambers killed him. He was asked, how so ? and replied, that Chambers had threatened to follow the two Turners, and beat them. He told Mahala Cashtelder, and she told Pinkestock, and he told him, and he expected that he had done so, and he was the one that killed Sam. At a later period of the night, the same person again said to the prisoner, if, when your brother is examined, any wounds are found ■upon him, you had better tell where you were, and remove the suspicion. He replied, no doubt there will be marks of violence upon him, but I am innocent. Betsey Turner testified, that she had a conversation with the prisoner, in which he wished her to tell her sister, Mahala, ■that Pinkestock said he could whip both the Turners. He said he was as clear as an angel in heaven. He afterwards told her, but before the body was examined, that he allowed her father had fallen on the bushes, and jabbed a hole in his throat — the body had lain so long, he said, that they could make nothing out. A man nearby overheard the conversation, and testified that he heard Betsey say to the prisoner, she was glad they had found father, for now they could '*bury him. The prisoner said, he had lain so long, and was so [27 rotten, that they could not discover any wounds or bruises upon him. This was about two or three o’clock in the morning.
A married daughter of the deceased testified that the defendant said to her in the fall before the death, that her father was an old son of a bitch, and he had as lief kill him as a rattlesnake, if it were not for the law, and he’d be found out in it. He was then cool and sober, and she said she thought it foolishness, until since her father’s death. After the pi-isoner was committed, his clothes were taken from him, and they were exhibited. There were some slight spots on the pantaloons, but much faded. The prisoner broke jail, with another prisoner. They were gone four days before they were recaptured. In the meantime, he had been at Ms brother’s house.
H. Stanberry and H. H. Hunter,
addressed the jury for the state, and cited the 4 Blk. C. 189 — 90 ; Add. 282.
G. Swan and T. Ewing, contra.
WRIGHT, J. explained the different counts of the indictment to the-jury, and read to them the sections of the statute on which they were called to act (22 O. L. 158). He said the indictment charged the defendant with three offences, of one of which they must find him guilty upon the evidence, if they found for the state, viz. : murder in the first and second degree, and manslaughter.
Murder in the first degree, he said, is the intentional, unlawful killing, by one reasonable being of another, in the peace of the state, of deliberate premeditated malice. Murder in the second degree, is the intentional, malicious, and unlawful killing, by one reasonable being of another, in the peace of the state, without deliberate or premeditated malice. Manslaughter is the unlawful killing, by one reasonable being of another, in the peace of the state, without malice either upon a sudden quarrel, or unintentionally, while the slayer is. in the commission of some unlawful act.
Malice, and .a design to hill, are essential ingredients in the crime of murder, in cither degree, while the first ingredient is altogether excluded from the crime of manslaughter. The intention, or design to hill, is also excluded from the crime of manslaughter, where the death results from an unlawful act, designed to effect another object but, if there arise a sudden quarrel, and one, under great provocation, instantly kill another, intentionally, it would be manslaughter. Malice is the dictate of a wicked, depraved and malignant heart. It is not necessary that the malignity should be confined to aparticular ill-will towards the person injured. It is evidenced by any act which springs from a wicked and corrupt motive, attended by 28] Circumstances indicating a heart regardless of social duty, and bent on mischief. Malice is said to be express where the cruel act is done with a senate and deliberate mind — with settled and formed purpose. This kind of malice is generally evidenced by the circumstances preceding and attending the -transaction complained of, as by threats, menaces, formed grudges, lying in wait, concerted schemes to do injury, or by an unusual degree of cruelty attending the act. Malice is implied where the killing is sudden, without any or greatprovocation; and, also, where the act done necessarily shows a depraved heart, as the giving of poison.
We understand it to be a rule of law, in England, that any person who deliberately does an act which apparently endangers the life of another, and thereby occasions his death, shall, unless he clearly *29 prove the contrary, be adjudged to kill him, with malice prepense, •or aforethought, (1 East. C. L. 225.) In every charge of murder, in that country, the rule is, that when the fact of killing is established, the law presumes the killing founded in malice aforethought, until the contrary is made to appear ; therefore, in that country, the circumstances relied upon by way of justification, excuse, or alleviation, if they do not arise out of the proof for the prosecution, must be introduced, and proven on behalf of the accused, or he is held guilty of murder, (1 East. C. L. 340.) The presumption of the English rule, we think, should be carried no further under our law and practice, than to raise from the fact of killing, the presumption of murder in the second degree, if there be no explanatory circumstances in the evidence introduced by the state, and none are proven by the prisoner. Such legal presumption ought not to be carried to take away life, if it can be avoided. To establish premeditated malice, some affirmative evidence should be introduced by the prosecution. But the evidence as to this, as well as all the other ingredients of crime, or other thing connected with human transactions, may be either positive, or circumstantial. Whichsoever kind is resorted to, however, should be of a nature to convince the understanding of the jury. Circumstantial evidence is often the mostconvincing. It is difficult to fabricate the connected links in a chain of circumstances, so as to preserve the semblance of truth. It is more easy, where perjury is intended, to fabricate positive facts. When the •circumstances detailed are real and natural, they will correspond with each other; when they are inconsistent with each other, or irreconcilable with admitted or proven facts, there results a plain and almost certain inference, that artifice has been resorted to, and that the tale is not true. All the evidence, whether positive *or circumstantial, should [29 'be deliberately weighed, with great care and caution. The law presumes every individual innocent of crime, and requires proof to •satisfy the minds of the jury that a defendant is guilty before they are warranted in pronouncing him guilty. The prisoner is entitled to the benefit of this presumption, and it should be yielded against him only when you are convinced by the evidence of his guilt.
Counsel have addressed you at length on the subject of your tloubts. If you entertain a reasonable doubt as to any one of the essential facts which constitute the crime of murder in the first degree, :you should acquit the prisoner of that crime, as it is the humane rule -of the law that no one shall forfeit his life for a crime when there exists a reasonable doubt whether the crime has been committed. But that is a rule of law adopted in favor of life, and is therefore, *30 in this case, only applicable to the charge of murder in the first degree — it does not apply to either of the other offences embraced in the indictment. It is impracticable to attain to absolute certainty in human affairs. In the nature of things, we can only attain to reasonable certainty. A juror is not authorized to raise an artificial or captious doubt, in order to acquit the accused; the doubt he relies upon should be real, and honestly and fairly entertained,, after all reasonable efforts have been made to find out the facts. Although the rule of law on the subject of doubts does not apply to crimes not punishable with death, yet in all criminal cases the jury should scrupulously examine all the circumstances and facts in proof for and against the accused, and hold him innocent until he is proven guilty; and if, ujDon a candid examination of the evidence, the conviction results that he is guilty, a jury should so find — in so doing they will discharge their duty.
To warrant you in finding the defendant guilty of either of the offences described in this indictment, the evidence must satisfy you of three general facts: 1st. That Samuel Turner is dead. 2d.-That he came to his death by a wound upon the neck, inflicted by some sharp instrument. 3d. That the defendant inflicted the wound when of sound mind. To determine these questions, you should carefully consider all the evidence, with the attending circumstances,- and the arguments of counsel on both sides. There seems no room to doubt of Samuel Turner’s death. Was his death occasioned by cutting the throat? Did the prisoner do the act? Was he then of' sound mind? These questions you must answer upon the evidence given you in court. If in your opinion the proof fail to establish any one of these three essential ingredients of the offences charged 30] *upon the prisoner, you should acquit him at once. But if you are satisfied of the death, that it was occasioned by the wound in the neck, and that the prisoner inflicted it, then you will have occasion to examine further. Much has been said to you about the drunkenness of the prisoner, as conducing to show that he was of unsound mind. No reliance can be placed upon drunkenness as establishing the insanity of a person, which excuses him from accountability for crime. The habit of intoxication is highly immoral and vicious, tending to the destruction of the best interests of society — the severance of the dearest relations of life. He who takes an intoxicating draught, voluntarily makes himself mad, and the law, by reason of such' madness, will not excuse him from responsibility for crimes committed under its influence. If it were otherwise, the most hardened criminal would escape punishment; and the corrupt, and profli *31 gate, and revengeful, would only have to intoxicate themselves, to be exonerated from liability for crime, and to acquire the right to commit any act, however shocking and horrid, with impunity. In our opinion the law does not afford to bad men such protection.
To convict of murder in the first degree, you must, in addition to the points I have mentioned, be satisfied, 1. That the prisoner perpetrated the act purposely. 2. That he did it with intent to hill. 3. That he' did it of deliberate and premeditated malice. To constitute deliberate and premeditated malice, the intention to do the in: jury must have been deliberated upon, and the design to do it formed, before the act was done; though it is not required that either should have been for any considerable time before. This supposes the party, by reflection, understood what he was about to do, and intended to do it in order to do harm. If these things are all proven, and you find the defendant guilty of murder in the first degree, you need examine no further. If not proven to your satisfaction, you will then examine further.
To convict of murder in the second degree, you must be satisfied of the general facts common to all the offences, which I have stated, and also of the following: 1. That the prisoner perpetrated the act purposely and maliciously. 2. With intent to hill, and 3. Without deliberation or premeditation. If you are not satisfied of the concurrence of these facts, you should acquit him of murder in the second degree, and will be imder the necessity of examining further.
To convict of manslaughter, you must be satisfied by the evidence of the three common facts stated to you; and also, 1. That the act was done unlawfully. 2. Withoxit malice. 3. With intent to hill, formed in the heat of a sudden quarrel, or, 4. Without intent to hill, *while the prisoner was engaged in the commission of some un- [31 lawful act. If in your opinion the act was done maliciously, whether the malice be either express or only implied, the offence, whatever it is, is not manslaughter: so, if you find an intention to hill, and that there was not great provocation, or a suddenly excited passion, the crime, if any has been committed, is not manslaughter.
[The judge here briefly recapitulated the circumstances relied, upon, for and against the prisoner, and continued]: You will, gentlemen, examine all the circumstances with a sincere effort to learn the true state of facts in the case, and if it shall appear to you, that the prisoner destroyed the life of his brother, by violently and deliberately cutting his throat, with intent to kill him, his crime is murder in the first degree. If he intended to kill, although he formed the design coolly but a moment before he struck the fatal blow, the law *32 esteems it a premeditated killing; (2 Stark. Ev. 722.) If itsball have been proven to you that the defendant purposely cut the throat of his brother with intent to kill him, but without deliberating upon the act or meditating upon it before it was done, his crime is murder-in the second degree. But if it shall appear to you that the death ensued solely from a sudden quarrel, while the defendant was under the transport of violent passion and provocation, or that the deed was done without any intention to kill, while the defendant was performing some other unlawful act, his crime is manslaughter.
*Swan, for the prisoner,
now moved in arrest of judgment, because,
1. The indictment was found, if at all, in the Court of Common Pleas, and the certificate of the alleged proceedings in that court has no seal, and was not made out and transmitted forthwith according to the law.
2. The proceedings, if properly certified, confer on the court no authority to try the prisoner, because they do not show who the judges of the Court of Common Pleas were, or who the jurors were, or whether there was a competent number of judges or jurors.
3. The certificate from the clerk of the Court of Common Pleas filed since the verdict, will not avail the state, because the Court of Common Pleas must certify up a more complete record, on a cer *33 tiorari, if the entries can be amended, but in criminal cases no amendment is allowed; 1 Ch. C. L. 69; 1 Sound. R. 249, n. a.
*32 It is your peculiar province to judge of the facts. It is ours to advise what the law is, but in this class of cases you can, if you choose to do so, judge of the law as well as of the facts of the case. When the facts are ascertained, the law determines the grade and name of the offence, and affixes the punishment. With the punishment you have nothing to do. You pronounce upon the simple question of guilt or innocence as the facts are disclosed in the evidence. It then becomes our duty to proclaim the sentence which the law affixes to the crime found. Both you and the court is bound by the law, and we have no right to substitute our own opinions of what the law ought to be for what we think it is — the safety of the community depends upon our declaring what the law is. If the law is impolitic, or the punishment too severe, the legislature should alter it, not the jury or the court.
If you find the prisoner guilty, you will state in your verdict whether you find him guilty of murder in the first, or second degree, or of manslaughter.
The jury retired about an hour, and returned a verdict, guilty of murder in the first degree.
*33 4. It does not appear that the indictment was recorded in the Common Pleas.
Hunter and H. Stanberry, for the state,
insisted that the objecttion was one of mere form, and the prisoner had waived it by going to trial. The certificate is not required in the law to be under seal. The original indictment is here, and the trial has been upon that. It is now immaterial what proceedings were had on that indictment in the Common Pleas; 1 Ch. C. L. 356.
T. Ewing, for the prisoner,
in reply, insisted that by the constitution and laws the Common Pleas alone had jurisdiction, and the only question was one of jurisdiction.
WRIGHT, J. The constitution of Ohio gives the judges of the Supreme Court power to take jurisdiction of such criminal cases as shall be pointed out by law, and to exercise it in such way as the law may point out; Const, art. 3; sec. 4. The act of assembly passed under this clause, conferred upon the Supreme Court original jurisdiction in all offences-, the punishment whereof is capital; 29 O. L. 56. The act pointing out the mode of trying criminals, 2 Chase 1334, provides that the person accused of an offence, the punishment of which is death, when he has the indictment read to him, may elect tobe tried in the Court of Common Pleas, and if he do not then so elect, the clerk of Court of Common Pleas, where the indictment is found, shall truly record the indictment, and forthwith make out a transcript of the same, with the proceedings of the court on such indictment, .under the seal of his office, and forthwith deposit such transcript, with the original indictment, in the office of the clerk of the. Supreme Court, &e., who shall proceed to trial *and judgment in the same manner as if the indictment had [33 been found therein.
The indictment in the case before us was found in the Court of Common Pleas. Of this we can know nothing, except in the way provided by law. In that way we can take jurisdiction of a crime indicted in another court, but in no other. The proceedings in the Court of Common Pleas we had not examined, and no objection was made to them at the trial. It is in our estimation essential to our jurisdiction that we know the proceedings of the Court of Common Pleas when the proceedings originate there. The law expressly provides that they shall be certified by the clerk of that court under the seal of his office. The paper offered here as the certificate has no seal. In a crime involving the life of a fellow being courts pro *34 ceed with great caution, and hold parties to a strict compliance with the law. We are authorized to proceed in cases so brought here, but have no authority to proceed against, try, and sentence to death an individual who comes here for that purpose by his own agreement, or being here otherwise, waives his right to object. Neither the express consent of the party nor his waiver of the-right to object can confer upon us such power. We can know the proceedings of the Court of Common Pleas only when certified under their seal. The certificate filed by the state, made out and dated since the verdict, cannot help the proceedings. If disposed in any case to allow a clerk thus to patch up his proceedings, and remedy defects arising from his negligence, after they are pointed out, we have no disposition to do so in a capital case, where the life of a fellow creature is in jeopardy. We are of opinion that the proceeding in this case so far, has been without authority of law, and improvidently had. We can go no further in the case as it now stands, and order the cause struck from the docket. If the sheriff have any authoritj^to detain the prisoner, he can look to him. We at present make no order about him.
SEP^The sheriff detained the prisoner upon his original commitment. The prosecuting attorney, the next Court of Common Pleas, nol prossed the indictment, and sent up to the grand jury a new one, which was returned a true MU. On the prisoner’s arraignment be stood mute, and therefore the Court of Common Pleas detei mined it had no jursidiction .of the case, because the former indictment was still pending in the Supreme Court. The Supreme Court at its next term in Bank, granted a rule to show cause why a writ of 34] mandamus should not issue, commandingtheCommon*Pleasto proceed in the case; 5 O.R. 542. After this, the prosecutor nol prossed the count in the second indictment for murder in the first degree, and the defendant pleaded guilty to the count for murder in the second degree, and was sentenced to the penitentiary for life.
[What is malice in homicide; State v. Noble, 1 W. L. J. 23; State v. Walker, 8 W. L. J. 145, 148. Intent in manslaughter, doubted; Montgomery v. State, 11 O. 424, 426. Criminal trial in Supreme Court, deliberation in homicide; Shoemaker v. State, 12 O. 42, 51, 53. Definition of homicide; Fouts v. State, 8 O. S. 98, 111. Proof beyond doubt only required in capital cases denied; Fuller v. State, 12 O. S. 433, 435. Presumption of non-intent where fact of killing is in doubt is limited to murder in second degree; Silvus v. State, 22 O. S. 90, 100.
Coroner’s inquest not competent evidence on trial for crime, distinguished; Wheeler v. State, 34 O. S. 394, 398.]