## Barnett's Appeal in Bell's Estate.

*Trusts, active and operative, discussed and defined.*

1. A devise to trustees of real and personal property, in trust to lease and let the real estate, to keep the personal estate invested on bond and mortgage, or other safe security, to collect and receive the rents, interest, and profits thereof, and to pay over to the children of testator the net income, is an active operative trust, and the estate vests in the trustees: the use is not executed, even though all the *cestui que trusts* are *sui juris*.

2. Kuhn *v.* Newman, 2 Casey 227, overruled.

APPEAL from the Orphans' Court of *Philadelphia.*

This was an appeal by Thomas Barnett, acting trustee under the last will and testament of James Bell, deceased, who appealed for himself and for Mrs. Eliza B. Field and James Bell, beneficiaries in the trust, from the decree of the Orphans' Court of Philadelphia confirming the report of the auditor appointed to audit, settle, and adjust the second account of Thomas Barnett and John B. Austin, trustees under the will of James Bell, deceased, and report distribution in their hands.

The appellee was Mrs. Ann Bell, mother and guardian of James Bell, a minor child of John H. Bell, deceased, who was a son of James Bell, deceased, the testator.

The case was this:—James Bell died September 23d 1853, aged about seventy years, leaving a will dated the 17th of that month.

[Barnett's Appeal.]

His personal estate was sufficient for the payment of all his debts and funeral expenses, except the sum of $148.09, which was carried to the account of his real estate.

The remainder of his property consisted of houses and lots in Philadelphia, and an annual ground-rent of $48, the whole of which yielded a yearly income of about $1500.

In this will, after several bequests and devises, which are unimportant here, he devised as follows:—

"Fifth. I give, devise, and bequeath to my executors, hereinafter named, all the rest, residue, and remainder of my estate, real and personal, whatsoever and wherever, to hold to them, my said executors, and the survivor of them—In trust for the following uses and purposes, and for no other use, intent, or purpose whatsoever, that is to say—In trust to let, lease, and demise the real estate, and keep invested the personal estate in bond and mortgage, or some other safe and substantial securities, and to collect and receive the rents, interest, and income and profits thereof, and out of the said income shall pay all the expenses necessarily incurred in keeping the said real estate in good order and repair, and all taxes and lawful charges that may be assessed or levied, as well upon the said real estate as the said personal estate, and also shall pay all expenses attendant upon the collection of the said rents and income, and shall pay over and distribute the net income of the said estate, real and personal, as follows—one third part thereof to my son, James Bell, for and during all the term of his natural life; one third part thereof to my son, John Bell, for and during all the term of his natural life; and the remaining third part thereof to my daughter, Eliza Field, for and during all the term of her natural life, for her own separate use, so that the same shall not be taken for the payment of the debts of her present or any future husband; and in case of the decease of one or two of my said children, without leaving lawful issue, then one moiety of the said net income shall be paid to each of the survivors, or the whole thereof to the survivor, as the case may be, for and during the natural life of the said survivors or survivor; and in case of the decease of all my children, without lawful issue them surviving, then the said estate, real and personal, shall descend to and be vested in such persons as by the laws of Pennsylvania is directed concerning the estates of intestates; and in case of the decease of one or two of my said children leaving lawful issue, then the portion of the said interest and income that was paid to the parent of such issue prior to his or her decease, shall be paid to such issue in equal proportions, if there be more than one, for and during the natural lives or life of the survivors and survivor of my said children; and upon the decease of the survivor of

[Barnett's Appeal.]

my said children, then my said executors, and the survivor of
them, shall divide, grant, pay, assign, and distribute all my said
estate, real and personal, to and among the issue of my said
children, in equal shares, such issue and their descendants, if
any, taking and receiving only such part or share thereof, as
his, her, or their deceased parent would have been entitled to, if
then living.

"Sixth. Should any of my real estate become dilapidated or
unproductive, or should any circumstances arise that would make
it to the interest of my estate that the same should be sold, or
should my executors deem a sale or sales necessary in the distri-
bution of my estate, then I authorize and empower my execu-
tors to sell either at public or private sale, or to let on ground-
rent, all such parts and portions of my said real estate as ought,
in the judgment of my said executors, or the survivor of them,
to be sold; and upon any such sale or sales, to grant and convey
the same in fee to the purchaser or purchasers thereof, so that
the said purchasers thereof shall not be required to see to the
application of the purchase-money, or be in any way liable or
responsible for the misapplication thereof; and all ground-rents
reserved by my said executors, payable out of and for any por-
tion of my real estate which shall be sold as aforesaid, shall be
held by my executors, and the survivor of them, for the same
uses and purposes as herein set forth concerning my residuary
estate; and all purchase-money received by my executors for the
sale of my said real estate, or in the redemption or paying off
the principal of any ground-rent by them reserved or held, shall
be invested in other real estate or ground-rents, or bond, mort-
gage, or in some other safe and substantial security, and shall
likewise be held by them as part of my residuary estate for the
uses and purposes above set forth and specified.

"Seventh. I constitute and appoint my esteemed friends,
Thomas Barnett and John B. Austin, executors of this my last
will and testament, hereby revoking and annulling," &c., &c.

In 1855 one of the houses belonging to the estate was de-
stroyed by fire, and was rebuilt by the acting trustee at a cost
of $2621.15, which sum was subsequently repaid by the proceeds
of the sale of other property of the deceased. In November
1854 the executors had filed an account of the personal property,
showing a balance due to them of $403.81. This account was
duly audited, and found correct. On the 22d of May 1857, they
filed their final account as executors, showing a balance due them
of $148.09, which was adjusted as above stated. At the same
time they filed their first trustees' account of the rents and in-
come of the real estate, which on being audited showed a balance
due them of $3681.69, and was thus confirmed absolutely.

[Barnett's Appeal.]

The second account, embracing the rents and incomes from April 1st 1857 to April 1st 1859, was filed in June 1859, in obedience to a citation which issued upon the petition of James Bell, one of the beneficiaries.

It was referred to John M. Collins, Esq., by whom the first account had been audited, whose report, disposing of all the questions submitted to him, was filed in May 1860.

To this report the accountant filed fifteen, and Mrs. Eliza B. Field ten exceptions, which, after argument, were dismissed by the Orphans' Court, and the report confirmed.

There were seven errors assigned, six of which were as to compensation, commissions, and interest. The principal objection to the action of the court below was in confirming that portion of the auditor's report, wherein he decided that the trust created and established by the will of the testator to keep the real estate in proper order and repair, &c., and to pay over the net income to the beneficiaries in equal portions, was no trust at all, and that by the terms of the devise the beneficiaries "each took absolutely vested estates tail in the one third part of the residuary real estate."

*Andrew Miller* and *J. Hill Martin*, for appellant, argued that although by many decisions in Pennsylvania it had been determined that a devise of lands to A., "and in case he die without issue," or "without leaving lawful issue," or "without issue him surviving," then over to B., vested an estate tail in the first taker, those cases were not analogous to this. Here is a devise to the trustees, in fee, in trust to collect the rents, keep the estate in repair, pay taxes and charges, sell any portion when in their judgment the interests of the estate required it, and to pay the net income to the testator's children in equal shares, and upon the decease of the survivor of his children, then to distribute among his grandchildren, if any, and if not then among his heirs, according to the intestate laws. The difference in the cases is obvious, and it needs no argument to discover it.

In Kuhn *v.* Newman, 2 Casey 227, Judge Lowrie says: "A trust is nothing that supports no interest and enjoins no duty;" but here is a trust vesting in the trustees important interests to be kept up and sustained, and enjoining upon them imperative duties, which they are legally and morally required to perform during the joint lives of the testator's children, and the life of the survivor.

Again: Here is a solemn instrument which, in language that cannot be misunderstood, vests the net income of real estate in children, and the corpus or principal thereof in grandchildren, if any, and if not then in the right heirs of the testator, and

providing that in case one or two of the children die without issue, then a moiety of the income shall be paid to the survivors or the whole to the survivor, as the case may be.

And here is the report of an auditor appointed "to audit and adjust an account, and report distribution of the balance," that annuls and sets aside the plain provisions of the solemn instrument, derides the intentions of the testator that made and executed it, and vests the whole property in absolute fee tail in those who were to have but the income during life. Is not this taking the property of one and giving it to another, and can such a thing be done by any power in the Commonwealth?

The Supreme Court have many times decided that the legislature possesses no such power: Norman *v.* Heist, 5 W. & S. 171; Menges *v.* Wertmen, 1 Barr 218; Lambert *v.* Hogan, 2 Id. 22; Brown *v.* Hummel, 6 Id. 86; Ervine's Appeal, 4 Harris 256; Shoenberger *v.* School Directors, 8 Casey 34. And if the legislature cannot take the property of one and give it to another, cannot annul and set aside the provisions of a solemn instrument, how can such a power be exercised by an inferior department of the government?

If a testator in Pennsylvania has sufficient dominion over his property to enable him to give the income to his children for life, and the remainder to his grandchildren in fee, that is all that James Bell has done in this case, and his will ought to stand.

*W. J. McElroy*, for appellee, argued, I. The trust is only to receive and pay over the rents and profits. Such a trust is executed: Kuhn *v.* Newman, 2 Casey 227; Bush's Appeal, 9 Id. 85; Kay *v.* Scates, 1 Wright 31.

There is no duty cast upon the trustees by this will that it is not also the duty of the guardian of this minor child to perform. There is no good reason for charging this minor's estate with double commissions, first to the trustees, and then to the guardian. Since the filing of the auditor's report, Mrs. Field, who then was a *feme covert*, has, by the death of her husband, become *discovert*. If she should now apply to the court to have her share of the estate delivered to her, would the trust stand in her way? Clearly not; Steacy *v.* Rice, 3 Casey 75; and if the form of a trust would not avail against her, why should it against the sons of the testator?

II. As to the nature of the estate devised. The will gives, 1st. The income to the children for life. 2dly. If one or two of the children die, leaving issue, the income to such issue *per stirpes* during the lives or life of the survivors or survivor of the children. 3dly. If one or two of the children die without leaving lawful issue, the income to the survivors or survivor for life. 4thly. On the death of the survivor of the children, to the issue

of the children and their defendants *per stirpes*. And, 5thly. If all die without lawful issue, then to those entitled under the intestate laws. Or substantially this: "to the children for life; after their decease to their issue; and if all die without issue, then over as under the intestate laws. This is an estate tail, according to all the authorities:" Smith on Ex. Int. 538; George *v*. Morgan, 4 Harris 95; Price *v*. Taylor, 4 Casey 95; Potts's Appeal, 6 Id. 168; Wynn *v*. Story, 2 Wright 166.

In this will the testator, by his gift to the parents for life, then to their issue, meant to provide for each child, and his or her issue for ever, and that the issue should take through the ancestor by descent, as the use of the word "descendants" proves. It is only after the death of children, and their issue and their descendants, that the estate leaves the line of the first taker.

So also by the devise over "in case of the decease of all my said children without lawful issue," cross-remainders in tail are clearly implied: Tenny *v*. Agar, 12 East 252; Clark *v*. Baker, 3 S. & R. 470.

The use of the words "them surviving," after the word "issue," makes no difference. The auditor refers to an important distinction between a limitation of this nature after a devise in fee and after a devise of a life estate, and shows that when used after a devise for life, it does not prevent the enlargement of that estate into an estate tail: 2 Jarman on Wills 440; Wright *v*. Pearson, 1 Eden 119; Doe *v*. Rucastle, 8 Man. Gr. & Scott 876; Mackell *v*. Weeding, 8 Sim. 4. So also Price *v*. Taylor, 4 Casey 95, where the words were "issue at her decease."

Nor are the words "to and among the issue," and "in equal shares," inconsistent with the gift of an estate tail. They do not restrict the meaning of the word "issue," nor turn it into a word of purchase or designation: Doe *v*. Alpin, 6 Durnf. & E. 82. See Tate *v*. Clarke, 1 Beav. 100; Doe *v*. Featherstone, 1 Barn. & Ad. 944; Moorke *v*. Brooks, 12 Grat. 135; Ross *v*. Toms, 4 Dev. N. C. 376; Jesson *v*. Wright, 2 Bligh 2; Doe *v*. Smith, 7 T. R. 531; Doe *v*. Cooper, 1 East 229; Mogg *v*. Mogg, 1 Mer. 654; Maurer *v*. Marshall, 4 Harris 377.

Neither will the word "descendants" prevent the word "issue" from operating to give an estate tail. The argument of the auditor on this point is conclusive. Whether "descendants" means heirs of the body or heirs general, the meaning of issue is not restrained as a word of limitation: Dodson *v*. Grew, 2 Wils. 322; King *v*. Burchell, 1 Eden 424; Denn *v*. Puckey, 5 Durn. & East 299; Frank *v*. Stovin, 3 East 544. There is no departure from the ordinary line of descent from the first taker. Superadded words of limitation engrafted on words of procreation will not operate to turn these into words of purchase, unless the superadded words denote a different species of heirs from that described by the first words: George *v*. Morgan, 4 Harris 94. The

[Barnett's Appeal.]

obvious meaning of the words here is "issue, and the issue of issue,"—the division directed in *per stirpes* taking the testator's children as *propositi*. The line of descent indicated is according to the course of the common law, and it is in reference to that course of descent that a testator in this state is to be regarded as speaking: George *v.* Morgan, *supra;* Carter *v.* McMichael, 10 S. & R. 429; Paxson *v.* Lefferts, 3 Rawle 59; Hileman *v.* Bouslaugh, 1 Harris 353. See also Caskey *v.* Brewer, 17 S. & R. 441.

It is to be remarked that although the word "issue" in equal proportions may be regarded as referring to grandchildren, yet this is in regard to the income, and does not control the effect of the word when employed in limiting the inheritance. At the time of the will taking effect James Bell and John H. Bell, the testator's sons, had no children. Even if the word "children" or "grandchildren" were used in limiting the inheritance, with the devise over "on dying without issue," such use of those words would not restrain the operation of the word "issue" as a word of limitation: Doe *v.* Simpson, 5 Scott 770; Broadhurst *v.* Morris, 2 B. & Ald. 1; Nightingale *v.* Burrell, 15 Pick. 105; Eichelberger *v.* Barnitz, 9 Watts 449; Haldeman *v.* Haldeman, 4 Wright 29.

It may be further observed that the provision, in the same clause, for the payment of the income to the issue of a deceased child, during the lives of the survivors of the children, if it has any effect at all—and it is submitted that it has none—cannot postpone the vesting of the estate.

It is therefore submitted that, according to the intention of the testator in not allowing the estate to go over until all the line of issue of his children should be exhausted, but giving it to the children, then to their issue and the descendants of the issue; and according to the rules of law defining the words used by him, and the clear import of the authorities, the estates devised by this will are estates tail in the sons of the testator; and John H. Bell, one of the sons, having died without barring the entail, it has descended upon James Bell, Jr., this appellee, subject to the right of dower of his mother.

Should the court not be of the opinion that the devise was of an estate tail, it is then submitted that if John H. Bell took an estate for life only, that estate having determined, his son, the appellant, takes, under the 5th clause of the will, an absolute estate in fee simple in the portion of the estate devised to his father.

The opinion of the court was delivered, January 25th 1864, by READ, J.—Trusts have been divided into passive or technical, and active or operative trusts; with the nature and extent of the

latter of which classes it is our present purpose to deal. Amongst the active trusts has always been classed, that to receive and pay over the profits to another, in which case the land must remain in the trustee to enable him to perform the trust. So where it is the testator's intention, or where it is necessary for the accomplishment of any object of his will, that the legal estate or possession of the land should remain in the trustee for the purpose of administering the trust. So, also, where the trustee is to dispose of the property, or pay the rents over to the *cestui que trust*, or apply them to his maintenance, or to make repairs, or to pay annuities, or to manage with the estate as he should think most for the interest of the *cestui que trust*, or to pay the rents to a married woman, or suffer her to receive them.

In all these cases the legal estate does not vest in the *cestui que trust*, and the use is not executed by the statute in him. This was not only received as law in Pennsylvania, but in some instances greater restrictions were placed on *cestui que trusts* than were allowed in England. In Lancaster *v.* Dolan, 1 Rawle 231, it was held that a *feme covert* is, in respect to her separate estate, to be deemed a *feme sole* only to the extent of the power clearly given by the instrument by which the estate is settled, and has no right of disposition beyond it; which was reaffirmed in Pullen *v.* Rianhard, 1 Whart. 520; Thomas *v.* Folwell, 2 Id. 11; Dorrance *v.* Scott, 3 Wh. 316; Lyne's Ex'rs. *v.* Crouse, 1 Barr 111; Rogers *v.* Smith, 4 Id. 93; Pennsylvania Insurance Company *v.* Foster, 11 Casey 134; Wright *v.* Brown, 8 Wright 224, and is the unquestioned law of the state. In the former case Chief Justice Gibson said, p. 247 : "Nothing in the law is more to be deprecated than those decisions in which the right of a *cestui que trust* to dispose of his estate has been recognised. Every attempt to secure a provision to a spendthrift son must prove abortive, while the trustees are bound to follow any disposition of it which he may make. It is still more unfortunate, that, as regards their separate estates, *femes covert* have been regarded in equity as *femes sole*. It has been justly remarked that if the principle be pushed to its extent, a married woman who has trustees, will be infinitely worse protected than if she were left to her legal rights." In the very same year, in Fisher *v.* Taylor, 2 Rawle 33, the court (carrying out the expressed views of the chief justice), where land was purchased by and conveyed to executors under the provisions of the testator's will, in trust for the testator's son, who was to have the rents, issues, and profits thereof, but the same not to be liable to any debts contracted, or which may be contracted by his said son, and at his death the said land to vest in the heirs of the body of the said son in fee, held, that the son has not such an interest in the land as could be taken in execution and sold for his debts.

[Barnett's Appeal.]

After stating that the executors necessarily took the legal estate for the purposes of the trust, in order to give effect to the testator's intention, Smith, J., said, page 37 : "A man may undoubtedly so dispose of his land as to secure to the object of his bounty, and to him exclusively, the annual profits. The mode in which he accomplishes such a purpose, is by creating a trust estate, explicitly designating the uses, and defining the power of the trustees. All this, we think, has been sufficiently effected in the case under consideration. Nor is such a provision contrary to the policy of the law, or of the Act of Assembly. Creditors cannot complain because they are bound to know the foundation upon which they extend their credit. The Act of Assembly, cited from 1 Smith's Laws 7, does not apply, the land in question not being the land of Sample Taylor, the defendant. He has no life estate in it, nor any interest in it which is subject to be sold for the payment of his debts. The benefit he derives under the will of his father is merely the right of receiving from the trustees the rents and profits of the premises which they hold under the deed from John Graham and wife; to the perception of those rents and profits, they are in the first place entitled for the purpose of fulfilling their trust."

The same in principle was decided in Holdship *v.* Patterson, 7 Watts 547, in 1838, Chief Justice Gibson delivering the opinion of the court; in 1843, by Justice Kennedy, in Ashhurst *v.* Given, 5 W. & S. 323, who quotes approvingly the language of the chief justice in the former case: "A benefactor may certainly provide for a friend (and especially a child), without exposing his bounty to the debts or improvidence of the beneficiary. He has an individual right of property in the execution of the trust, and to deprive him of it would be a fraud on his generosity (parental duty). To appropriate a gift to a purpose or person not included, would be an invasion of the donor's private dominion." Fisher *v.* Taylor was distinctly affirmed in Vaux *v.* Parke, 7 W. & S. 19, in 1844. Sergeant, J., speaks of "a *simple* trust, which gives the *cestui que trust* a right to the possession, control, and disposal of the lands, and a special trust, which gives him no more than the right to enforce in equity the intention of the testator to the extent of his interest. The distinction between these two classes of trusts pervades the whole doctrine of trusts, and without a due regard to it, their existence cannot be preserved."

The subject was discussed in 1847 by Coulter, J., in Norris *v.* Johnston, 5 Barr 287, in which he compares the English rule with our rule. In both the creditor loses; but by ours the intention of the testator is carried out in favour of the object of his bounty; ours is a humane rule, whilst the English one is harsh and unnecessarily severe, and has been largely affected by the bankrupt law, which has no existence with us.

[Barnett's Appeal.]

In Eyrick *v.* Hetrick, 1 Harris 491 (1850), Bell, J., said: "The fact that the conveyance was made to assume the form of a trust, and for the special purpose of keeping John's creditors at bay, makes nothing against its validity, so far as the latter are concerned, for neither policy nor equity prohibits a parent to make such provision for the maintenance and comfort of an insolvent child; on the contrary, these trusts are favoured and sustained by the law, as suggested by the best feelings of our nature, and doing harm to no one: Fisher *v.* Taylor, 2 Rawle 33; 7 Watts 547; 5 W. & S. 323."

In Brown *v.* Williamson's Ex'rs., 12 Casey 338, in 1860, several of these cases are distinctly approved by the learned judge in the court below, and by my brother Strong, in affirming the judgment. All these cases were decided with a full knowledge that they were not in conformity with the English decisions.

A similar policy prevails in Connecticut; 2 Rev. of Swift's Digest (1853), pp. 121, 122; and is affirmed in Leavitt *v.* Beirne, 21 Conn. 8, 9: "A provision may be made for the support of a child, relation, or other person, by vesting a fund in trustees to be applied to that purpose. In this way a man may provide for a daughter who has an improvident husband, or for an improvident child, and may make a permanent provision for the support of a family."

So the legislature of Pennsylvania, seventy-one years ago, converted a naked authority to executors to sell, into an estate in the land, and the executors into trustees, and the policy has been carried out by the courts in good faith.

In New York, where a systematic change in the doctrine of trusts was made by legislative authority, by which all uses and trusts, except as therein modified and authorized, were abolished, and all estates and interests in lands were made legal estates, except when otherwise provided, certain express trusts were allowed to be created; amongst those was a trust "to receive the rents and profits of lands, and apply them to the use of any person during the life of such person, or for any shorter term:" 3 Rev. Stat. 16.

The Revised Statutes provide that every express trust, valid as such in its creation, except as therein otherwise provided for, shall vest the whole estate in the trustees, in law and equity, subject only to the execution of the trust. The persons for whose benefit the trust is created, shall take no estate or interest in the land, but may enforce the performance of the trust in equity; and no person beneficially interested in a trust for the receipt of the rents and profits of lands, can assign or in any manner dispose of said interest: Id. 21.

The security of the *cestui que trust* is complete, and under no

10 WR.—26

[Barnett's Appeal.]

circumstances can he be deprived of a maintenance. The case of Noyes *v.* Blakeman, 2 Selden 567, is one of the strongest instances of the inflexibility of the rule in preventing a *feme covert* from rendering her interest liable. "It is an error," says Justice Welles (p. 579), "therefore, it seems to me, to call this right a separate estate. It is no estate whatever." And such is the general rule as to all *cestui que trusts,* who are strictly only entitled to enforce an execution of the trust, but have no estate in the land.

The only question of importance in the case before us, is the nature of the estate vested in his executors by the will of James Bell. The fifth clause in the will devises and bequeaths to his executors all the residue of his estate, real and personal, to hold to them and the survivor of them in trust for certain uses and purposes—these are, to lease the real estate, keep invested the personal estate in bond and mortgage, or other safe and substantial securities, collect and receive the rents, interest, and income, and profits thereof; and out of the said income pay all expenses attendant, necessarily incurred in keeping the said real estate in good order and repair; and all taxes and lawful charges that may be assessed or levied, as well upon the said real estate as the said personal estate; and also all expenses attendant upon the collection of the said rents and income, and pay over and distribute the income of the said estate, real and personal, as follows : One third part to his son James Bell, for and during all the term of his natural life ; one third part to his son John Bell, for and during all the term of his natural life; one third part to his daughter Eliza Field, for and during all the term of her natural life, for her own separate use, so that the same shall not be taken for the payment of the debts of her present or any future husband; then follow certain provisions looking to the death of the survivor of his three children, as the period at which the devisees are to be ascertained, who should be entitled to the capital of his property. In case all his children died without lawful issue them surviving, his said estate, real and personal, is to descend and be vested in such persons as by the laws of Pennsylvania is directed, concerning the estates of intestates. In case of the decease of one or two of his children not leaving lawful issue, then one moiety of the said net income to be paid to each of the survivors, or the whole thereof to the survivor, as the case may be, during the natural life of the said survivors or survivor.

In case of the decease of one or two of his children, leaving lawful issue, then the portion of the said interest and income that was paid to such parent prior to his death, to be paid to such issue in equal proportions, if there be more than one, during the natural lives or life of the survivors and survivor of his said children.

[Barnett's Appeal.]

Upon the decease of the survivor of his children, then his executors or the survivor of them to divide, pay, assign, and distribute his said estate, real and personal, to and among the issue of his said children in equal shares; such issue and their descendants, if any, taking and receiving only such part or share thereof as his, her, or their deceased parent would have been entitled to if then living.

The executors were also authorized to sell either at private or public sale or let on ground-rent, such parts of said real estate as they thought, ought to be sold, and to convey the same. All ground-rents reserved by the executors, to be held by them and the survivor of them, to the uses and purposes before set forth; and all purchase-money to be invested in other real estate, or ground-rents, or bond and mortgage, or in some other safe and substantial security, to be held for the same uses and purposes.

It is clear, therefore, that the testator intended his executors to be invested with a trust estate, which should not expire until the death of the survivor of his three children. The trust was an active one, demanding the personal attention of the trustees, and being restricted to three lives actually in being at the death of the testator, does not infringe upon the rule against perpetuities; nor is there any prohibition against alienation by the *cestui que trusts*. Upon the death of the surviving child this active trust ceases, and the estates become vested in the parties entitled to it at that period. The estate, therefore, in the *cestui que trusts*, is an equitable one during the lives of the three children, and of their survivors and survivor. Whatever may be the estates to which any one may become entitled at the death of the survivor, they are legal according to our law.

The auditor, however, entertained a different opinion, and at the date of his report, the devisees were James Bell and Eliza Field, then a widow, and James Bell, a minor child of John H. Bell, deceased, called John Bell in the will; the said James Bell being born after the death of the testator. The auditor, upon the authority of Kuhn *v.* Newman, 2 Casey 227, held that there is no trust whatever, and that, in other words, the trust is executed. This decision of the auditor renders nugatory all the careful provisions of the testator, made to preserve his estate during the lives of his three children; and this obliges us to consider the grounds upon which that case was decided. It has been complained of at the bar as unsettling the law of trusts in Pennsylvania, and has been the subject of grave criticism.

The principal error is in laying down as the law of Pennsylvania, that a trust to receive rents and pay them to another is executed, although not an use executed by the Statute of Uses, but arising from some general principle inherent in the common law of the state. This is not supported by authority; for in

Pullen *v.* Rianhard, 1 Whart. 521, it was distinctly held, that in such case the legal estate must continue in the first devisee, so that he might perform the trust; because, without having the control of the estate, he could not receive the rents and pay them over as directed.   This was clearly the law then, and there was no act of the legislature changing it between that decision and the one under discussion—a lapse of only twenty years.

The general observations as to the futility of restraints upon property, must be limited by the law, as emphatically declared in the two classes of cases commencing with Lancaster *v.* Dolan and Fisher *v.* Taylor, nor is the jurisdiction of the Orphans' Court, which has existed, with various powers, from the foundation of the province, a sufficient reason for annihilating the settled law of trusts for minors, and depriving a parent of the power of choosing the persons who shall control and manage the estate he gives to his child.   That this is not the law is clearly shown by two cases of undoubted authority.   In re John Wilson's Estate, 2 Barr 325, the testator had, by his will, in 1825, given his estate among his nephews and nieces; the share of William Wilson, one of his nephews, he gave to his executors thereinafter named, and to a majority of them who might take on themselves the execution of his will, and to the survivor in trust, to invest and apply the income to his maintenance, with authority at discretion, to pay him part or the whole of the principal.   In 1845, William Wilson was found a lunatic, and a Mr. Corson was appointed committee of his person and estate, who claimed to take the share of the lunatic.   Chief Justice Gibson (page 329), said: "Again, Mr. Corson's demand of William Wilson's share, as his committee, was properly disregarded."

"The testator devised his estate to his executors in trust, to invest the share in stock, or put it at interest, and apply the income to the lunatic's use, or pay him the whole or part of the principal, at their discretion.

"By what law, then, could the appointment of a committee take this trust out of the hands in which the testator had placed it, and vest it in one who can exercise no greater or other right than could, were he sane, be exercised by the lunatic himself? The estate was devised to the trustees *qua* executors; and if the distinction were material, it would consequently be clear that the appellant succeeded to the trust vested in his wife by succeeding to her executorship, with which it was indivisibly joined. But whether the appellant or his wife be the trustee, it is certain that Mr. Corson is not; and it is enough to prevent him from getting the direction of the lunatic's estate, that there is a trustee either *in esse* or *posse*.   The testator had a right to appoint his own trustee; and if the office were vacant, the proper course would be to fill it by appointment, for which the lunatic's

committee, whose business it is to call the trustee to account, would be the most improper person that could be selected."

In Vanartsdalen v. Same and Cornell's Appeal, 2 Harris 384, a grandfather appointed his executors guardians of his grandchildren, and gave them, the executors, the management of the estate devised by him to his grandchildren, and the father waived his parental right. It appeared that the father, after waiving his parental rights, applied to the Orphans' Court, and had a guardian appointed for his children, who discontinued an ejectment for the children commenced by the executor, who was appointed by their grandfather's will their guardian.

Judge Rogers, delivering the opinion of the court (p. 387), said: "Even conceding the testator has appointed a guardian for the persons of his grandchildren, as well as a trustee or curator for the estate devised, yet the appointment would be good, inasmuch as the father has submitted to the will by an enjoyment of the estate devised in right of his wife during her life. For it is only since her decease he has acted in opposition to the will." "It is plain the testator does not mean to interfere with the natural right of the father to the custody and care of his children; all that is intended is to commit the management of the estate to his executors, who are appointed guardians of the children. It is of no sort of consequence that he designates them as guardians rather than as trustees or curators of the estate, for the benefit of the infants. The will must receive such a construction as is beneficial to the minors, at the same time carrying out the intention of the testator. The disposition in the will does not require the assent of the father, as none of his rights are affected by it, nor is it in his power to defeat its provisions, or by any opposition work a forfeiture of the estate, as perhaps might be the case if the grandfather had undertaken to deprive him of the care and management of his children. What right has he to complain when a grandfather or mother, or even a stranger, devises an estate to his children, coupled with a condition that its care and management shall be intrusted to another rather than to him?

"The Orphans' Court have disregarded this distinction. They have treated the appointment by the grandfather as null and void, and have proceeded to appoint a stranger as guardian, without any notice whatever to the testamentary guardian. But so far from being void, it is not even voidable, except on proof of fraud or gross mismanagement, or some personal disability of the guardian. This we think is altogether irregular and erroneous, and for this reason the proceedings in the Orphans' Court must be reversed."

This decision is supported by the case of Smithwick v. Jordan, 15 Mass. 113, where, under almost entirely similar circumstances,

the same doctrine is laid down by Chief Justice Parker. There the devise was to a minor of seven years in fee, but he was not to come into possession, occupy, or have any advantage of said estate during his minority, except through his guardian. The testatrix appoints her executor to be guardian of the minor until he shall attain the age of twenty-one years, if he shall so long live; directs the guardian to lease, occupy, and improve the estates, and from the rents and profits to maintain and educate the minor. The court said: "A present estate in fee was devised, and it was the possession only which was postponed." "And the words of the will are sufficient to create a trust estate in the tenant (the guardian), by which he may hold the estate for the purpose for which the trust was created, until, by the will, the devisee can take possession for himself."

In Steacy v. Rice, 3 Casey 75, the trust for the married woman was not for the trustee to receive and pay over, but simply for her use; and the husband having died, the court held that the life estate of the widow became a legal one, which does not touch the present question. In Bush's Appeal, 9 Casey 85, two judges dissented. In Kay v. Scates, 1 Wright 31, my brother Strong evidently proceeds on the authority of Kuhn v. Newman.

In Massachusetts, our old settled doctrine prevails: Cleveland v. Hallett, 6 Cushing 403; Fay v. Taft, 12 Id. 448; 15 Mass. 113, above cited. In re Birtle's Estates, 32 L. Jour. Ch. 439, the lords justices, on the 25th of May last, decided in a case like the present, that the trust estate remained in the trustees during a life or lives in being, and on the expiration of the last life, it vested in persons in fee simple, who were not ascertained until that event happened. In this case, property was by will limited to trustees during the life of the longest liver of the testator's wife and five children, and from the death of such longest liver, to the respective issue then living of his children, in undivided fifth shares as tenants in common in fee, with cross-remainder limitations. The longest liver of testator's wife and five children died in 1861, when the property vested absolutely in fee in undivided shares in numerous individuals. The absolute vesting was thus postponed for six lives in being at the death of the testator, and might have been carried twenty-one years further: Pownall v. Graham, 9 Jurist, N. S. 318.

The question then is, shall the settled law of Pennsylvania, as to trusts, remain as it was understood by all our tribunals and by the bar, and had been received since the foundation of the province to within the last eight years, or are we, without the sanction of the legislature, entirely to uproot it, and substitute a new system which has been the subject of serious criticism and constant complaint?

[Barnett's Appeal.]

We do not approve of such judicial legislation, and are therefore of opinion that the auditor and the court below erred in declaring that there was no estate vested in the trustees of the testator's will, and, so far, their decree must be reversed.

It is therefore ordered, decreed, and adjudged, that so much of the decree as declares that there is no estate vested in the trustees of the testator's will, be and the same is hereby reversed; and all proceedings upon that declaration are reversed, and the residue of the said decree is affirmed. The costs to be paid by the estate in the hands of the trustees.