|131|241|
|139|592|

|131|241|
|152|255|

# PEOPLES SAV. BANK v. CHRIST. DENIG ET AL.

## APPEAL BY DEFENDANTS FROM THE COURT OF COMMON PLEAS NO. 1 OF ALLEGHENY COUNTY.

Argued November 6, 1889—Decided January 6, 1890.
[To be reported.]

1. To refer the jury to the general charge for answers to points presented by the parties, is a bad practice, which may hereafter be treated as of itself ground for reversal; the remarks of Mr. Justice PAXSON in Huddleston v. West Bellevue Bor., 111 Pa. 110, and of Mr. Justice WILLIAMS in Duncan v. Sherman, 121 Pa. 520, condemning this practice, reiterated and emphasized.

2. While it is not in all cases necessary to answer specifically every one of a series of points, it is necessary to instruct the jury upon the legal rule controlling the questions suggested by the points; if, for answer to a point which is well put, the jury are referred to the general charge, and it does not in fact answer the point, this alone is a sufficient reason for reversal.

3. A devise of land in trust to permit a married woman to occupy and enjoy it for her separate use, free from the control and debts of her husband, during her natural life, and at her death the land to descend to

the issue of her body, with power in the trustee to extinguish the trust at his discretion, creates a separate use trust in her favor, with remainder to the issue of her body.*

4. Such a trust becomes executed upon the death of the husband or the divorce of the parties, but, except as otherwise provided in the instrument creating it, nothing short of death or divorce will effect this result; and an extinguishment of it will not be produced by the husband's desertion of the wife, though the circumstances be such as to constitute her a feme sole trader.

5. It is to be regretted that the feme sole trader act of May 4, 1855, P. L. 430, permits such a loose practice as the claiming of its benefits without obtaining an adjudication or decree establishing the facts upon which the married woman's right to exercise the powers conferred by it is based, and the act should not be extended by implication to cases not fairly coming within it: per Mr. Chief Justice PAXSON.

6. The provision in said act of 1855 that a married woman in the enumerated cases shall have the right to dispose of her property as a feme sole, does not apply to property held for her upon a separate use trust; she has no power to convey, mortgage or otherwise incumber property so held, even though she be entitled to the rights of a feme sole trader under the act.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 228 October Term 1889, Sup. Ct.; court below, No. 39 June Term 1886, C. P. No 1.

On March 10, 1886, the Peoples Savings Bank brought ejectment against Christian Denig, terre-tenant, with notice to Benjamin F. Wilson, the Woods Run Savings Fund and Loan Association, James Wallace, and Amelia Gilleland Irwin and husband, to recover a tract of land in Allegheny county. The defendants' plea was not guilty.

At the trial, on December 17, 1888, the following facts were shown:

Barnett Gilleland died about November 1, 1845, seised of certain lands in Wilkins (now Braddock) township, Allegheny county. By his will, dated March 13, 1844, and duly admitted to probate upon his death, after indicating a division of said lands into three parcels, he gave to his son James the choice of either of said parcels, and to his son William he devised another parcel, in trust, in the following words:

---

*See Carson v. Fuhs, following.

" 6. To my son William I hereby give and bequeath in special trust and confidence as trustee of my daughter, Lydia Wallace, the second choice (after my son James), of the above three allotments in Wilkins township, that he will permit the said daughter, Lydia, to occupy and enjoy the same for her separate use, not to be under the control or subject to the debts of her husband, but to enjoy all the rents, issues and profits during her natural life, and at her death to descend to the issue of her body, but if the said Lydia should die leaving no issue, then the said estate to revert back and be a part of my residuary estate ; the same to be in full of my said daughter, Lydia's part, except the bequest hereinafter made out of my residuary estate."

The testator made his son William trustee of certain other devises and bequests also, and by a subsequent clause of the will provided as follows :

" 14. It is my desire and will that at any time my son William shall think right and proper and prudent, he may surrender any of the foregoing trusts ; he may surrender and assign the same to Nancy Guthrie, Lydia Wallace or Euphemia Marshall, of either or all of said trusts ; but it is my wish that he would not do so unless fully satisfied of the propriety of that course."

At the date of said will, the testator's daughter Lydia was the wife of James Wallace, one of the defendants in this action.

After the death of Barnett Gilleland, William Gilleland, the trustee of Lydia Wallace under the will, with her consent executed a deed of partition between himself, as trustee, and the other parties in interest, by which the tract in controversy was designated and allotted as the land to be held by him in trust for said Lydia.

In 1864 William Gilleland died, and no trustee was ever substituted in his place. On March 1, 1873, Lydia Wallace made a deed for the land in controversy to John W. Wylie, declaring therein her purpose to bar all estates tail in the land, and Wylie reconveyed to her the same day. On May 17, 1873, she made a similar deed to Thomas J. Jack, who the same day reconveyed to her. Both of the deeds thus made by her were duly entered on the records of the Court of Common Pleas No. 1 of Allegheny county. In neither of them did her husband or her trustee join as a party.

On May 30, 1873, Mrs. Wallace, also without joinder of her husband, executed and delivered to the plaintiff a mortgage of the land in controversy for $10,000, for the enforcement of which this action was brought. This mortgage was offered in evidence by the plaintiff's counsel:

Objected to, for the reason that the mortgage of a married woman is incompetent, she being a feme covert.

By the court: Objection overruled, if this offer is followed by testimony showing that she was a feme sole; exception.[13]

Counsel for plaintiff then offered to prove by the deposition of Rachel Gilleland, that in 1848 or 1849, being prior to the execution of the mortgage, Mrs. Wallace left her husband, owing to his drunkenness and inhuman treatment and failure to provide for her, and continued thereafter to manage her property without any aid from him or support from him; and that he neglected and refused to provide for her.

Objected to, on the ground that this is a link in the chain of title, and defendants have had no notice of it in the abstract; and also, that the deposition contains testimony as to his acts, or his alleged desertion of his wife, prior to the passage of the act of 1855; and also, for the reason that the deposition tends to prove the acts and declarations of Lydia Wallace, which are not competent.

By the court: Objection overruled; exception.[14]

Under this offer, and similar offers as to other witnesses, the plaintiff adduced testimony tending to prove that in 1849, Mrs. Wallace left her husband on account of his failure to support her, and of his cruel treatment of her while intoxicated; that a few weeks afterward her husband induced her to return to him upon the promise that he would do better in the future; that in the fall of 1850 his conduct became so bad that it was impossible for her to live with him longer, and she left him permanently on account of his habits of drunkenness, barbarous treatment of her, and failure to do anything for her support; that from that time forward they never lived together, and he never contributed anything to her support, never offered to live with her and never interfered in any way with the management of her property or business, which she managed and controlled as if she were a feme sole. Testimony was presented by the defendants, tending to rebut these statements of the plaintiffs' witnesses.

Lydia Wallace died in May, 1880, leaving to survive her James Wallace, her husband, and an only son James S. Wallace. The Woods Run Savings Fund and Loan Association was a creditor of the latter, and in 1880, after the death of his mother, commenced a suit in foreign attachment against him, attaching as his the land here in controversy. Having obtained a judgment in that suit, the association caused the land to be sold thereunder at sheriff's sale and became the purchaser, receiving a deed from the sheriff on December 29, 1883. It then went into possession, and at the time the present action was commenced Christian Denig was in the occupancy of the land as its tenant.

The other defendants claimed title in different ways. James Wallace as surviving husband of Lydia Wallace, claimed an estate by the curtesy, if she had an estate tail under her father's will. B. F. Wilson showed that under bankruptcy proceedings against James S. Wallace, begun in 1873, he purchased, and on July 15, 1875, received a deed for all the bankrupt's right, title and interest in this land. Wilson's claim was that under the will of Barnett Gilleland, James S. Wallace had a vested remainder in the land, subject to a life estate in his mother, Lydia Wallace, which was capable of sale by his assignee in bankruptcy, and passed by the assignee's deed. Amelia G. Irwin showed that by a deed dated May 8, 1880, but not recorded till June 12, 1885, James S. Wallace conveyed the land to her, and she claimed that he, as the issue of the body of Lydia Wallace, had, under the will of Barnett Gilleland, a good title at the time of executing that deed.

At the conclusion of the testimony the court, COLLIER, J., charged the jury in part as follows:

Gentlemen of the jury: [There are some legal questions involved in this case which we will not decide now, as it might possibly interfere with the taking of your verdict upon the questions of fact. We prefer to take your opinion as to the question of fact raised in the case, and that is, whether or not James Wallace neglected or refused to support his wife, Lydia Wallace, or deserted her. The property in controversy was her own, having been bequeathed to her by her father; and the only question in the case for you to determine is, whether

Charge of Court below.

or not her husband deserted her, or neglected or refused to support her. If he did, then she had a right to make this mortgage. If he did not, she could not mortgage the property without her husband joining. That is the sole question for you to determine in this case.] [18]

[Our Supreme Court has expressly decided, in a case that arose since the act of May 4, 1855, P. L. 430, that where the husband neglected or refused to support his wife, or deserted her, he thereby lost all right to her property, the right of possession or tenancy under curtesy; that is, the right to use it after her death for the balance of his life. The act of assembly upon that question passed in 1855 has been read to you by counsel, but I will read it to you again. The important part is this : § 2. " That whensoever any husband, from drunkenness, profligacy or other cause, shall neglect or refuse to provide for his wife, or shall desert her, she shall have all the rights and privileges secured to a feme sole trader under the act of 22 of February, 1718, entitled ' An act concerning feme sole traders,' and be subject as therein provided ; and her property, real and personal, howsoever acquired, shall be subject to her free and absolute disposal during life, or by will, without any liability to be interfered with or obtained by such husband," etc. The language of the law, as you will observe, if it applies to this case, and that will have to be discussed hereafter, is very broad and searching.] [19] . . . . .

You will take all the testimony and weigh it, remembering that the burden of the proof is upon the plaintiffs. They must satisfy you that James Wallace neglected or refused to contribute to the support of his wife Lydia, or that he deserted her. [If you are satisfied from the weight of the evidence that he neglected or refused to support her, or deserted her, prior to 1873, the date of the making of the mortgage, then you should find for the plaintiffs ; because if he did that, he had no right to have his name put to the mortgage. If, however, that is not made out to your satisfaction by the weight of the evidence, then you should find for the defendants.] [20]

[These instructions cover all the points submitted by counsel on both sides, and so far as they are answered in the affirmative by the general charge they are affirmed, and so far as denied, they are refused.] [21]

Arguments.

—The defendants presented a large number of points for instruction, two of which were as follows:

7. That plaintiff, if he recovers at all, must recover on the strength of his own title.[7]

12. That under all the evidence the plaintiff is not entitled to recover.[11]

The points were all answered together as follows:

Answer: All the foregoing points are sufficiently answered by the general charge, and in so far as they are in accord therewith they are affirmed, and in so far as they are not in accord therewith, they are refused.[7] [11]

The jury rendered a verdict for the plaintiff. A motion for a new trial was overruled without opinion filed, and judgment was entered on the verdict; whereupon the defendants took this appeal, assigning, inter alia, for error:

7, 11. The answers to defendant's points.[7] [11]

13, 14. The admission of plaintiff's offers.[13] [14]

18–21. The parts of the charge embraced in [ ] [18 to 21]

*Mr. N. W. Shafer* (with him *Mr. Joseph A. Langfitt, Mr. E. A. Montooth, Mr. C. C. Montooth, Mr. J. M. Garrison, Mr. Thomas M. Marshall* and *Mr. A. M. Imbrie*), for the appellants:

1. It is the settled law of Pennsylvania that a married woman has no powers over property which is the subject of a separate use trust for her benefit, other than those positively given to her by the conveyance creating the trust: Husbands on Married Women, 332; Thomas v. Folwell, 2 Wh. 16; Dorrance v. Scott, 3 Wh. 315; Lancaster v. Dolan, 1 R. 231; Wallace v. Coston, 9 W. 137; Cochran v. O'Hern, 4 W. & S. 100; Shonk v. Brown, 61 Pa. 320; Pullen v. Rianhard, 1 Wh. 520; Lyne v. Crouse, 1 Pa. 111; Rogers v. Smith, 4 Pa. 93; Penna. Ins. Co. v. Foster, 35 Pa. 134; Wright v. Brown, 44 Pa. 224.

2. The trust created by the will of Barnett Gilleland is an active one, for the protection of the cestui que trust, and such as the statute of uses does not execute: Barnett's App., 46 Pa. 392; Rife v. Geyer, 59 Pa. 395; Fisher v. Taylor, 2 R. 33; Kay v. Scates, 37 Pa. 37; Dodson v. Ball, 60 Pa. 496. The

trust was never surrendered in accordance with the fourteenth paragraph of the will and therefore continued till the death of the cestui. que trust. The rule in Shelley's Case has no application, and Mrs. Wallace's conveyance to the bank was in effect a disseisin on her part: Thompson v. Carmichael, 122 Pa. 478.

3. The intention of the testator, clearly manifested, was that his daughter Lydia should have no estate which should result beneficially to her husband. The language precludes the construction that he intended an estate-tail, an incident of which would be to give her husband a curtesy estate. Construe this will otherwise than as we contend, and we will have a feme covert controlling her property, contrary to the terms and intention of a trust intended for her protection, by the simple device of a desertion for a few weeks or months, executing all the special trusts for her benefit, and followed by a reconciliation. Her deeds to bar the entail were void.

*Mr. George B. Gordon* (with him *Mr. John Dalzell* and *Mr. William Scott*), for the appellee:

1. The only point in issue in the case was whether, at the time of executing the mortgage, Mrs. Wallace was a feme covert. Under the facts found by the jury she became, for the purpose of managing her property, a feme sole, and had a right to make the mortgage; the same state of facts terminated the trust created by her father's will, it being a dry trust, created solely for the purpose of protecting her from the encroachments of her husband; and, all reason for its continuance ceasing when she became a feme sole by her husband's desertion of her, the legal estate vested in her ipso facto under the statute of uses, and under the operation of the rule in Shelley's Case she became vested with an estate either in fee or in tail, it matters not which, because she subsequently barred any entailment by proper proceedings.

2. Every proposition necessary to support this mortgage has been decided by this court. The words in the will created an estate tail: James's Claim, 1 Dall. 47; Price v. Taylor, 28 Pa. 95; Ogden's App., 70 Pa. 501. The trust did not prevent this result; it could be sustained only temporarily: Ogden's App., supra; and upon the determination of the coverture the property vested absolutely: Dodson v. Ball, 60 Pa. 496; Koenig's App.,

57 Pa. 352; Bacon's App., 57 Pa. 504; Ogden's App., supra. It was not necessary that Mrs. Wallace should obtain a decree constituting her a feme-sole trader: Black v. Tricker, 59 Pa. 13; Elsey v. McDaniel, 95 Pa. 472. Nor was it necessary for her to refer in the deeds and mortgage to the facts bringing her within the feme-sole trader acts: Foreman v. Hosler, 94 Pa. 418. Her power of disposition under the act of May 4, 1855, P. L. 430, was absolute: Moninger v. Ritner, 14 W. N. 99; Ellison v. Anderson, 110 Pa. 486; and her husband can assert no curtesy estate against her grantee: Moninger v. Ritner, supra.

3. The proceedings barring the entail were proper, because the same facts which enabled the wife to give a deed without her husband's joinder, enabled her to bar the estate-tail without him. Besides, they were proceedings in court, have all the force and effect of a common recovery, and the judgment cannot be attacked collaterally: Act of January 16, 1799, 3 Sm. L. 338; Ransley v. Stott, 26 Pa. 126; Robb v. Ankeny, 4 W. & S. 128; Bellas v. McCarty, 10 W. 32. The declarations of the wife made at the time of her flight from her drunken husband are competent evidence: Bealor v. Hahn, 117 Pa. 169; Cattison v. Cattison, 22 Pa. 275; Gilchrist v. Bale, 8 W. 357; Starkie on Ev., Shars. ed., 51, 467, n. 1.

OPINION, MR. CHIEF JUSTICE PAXSON:

The first eleven specifications allege error in the answers to defendants' points. They were all answered as follows: " These instructions [the charge] cover all the points submitted by counsel on both sides, and so far as they are answered in the affirmative in the general charge they are affirmed, and so far as denied, they are refused."

We had occasion in Huddleston v. West Bellevue Bor., 111 Pa. 110, to pointedly condemn this mode of answering points. The points in that case had been answered in this general way, and we said: " This is a very unsatisfactory way of answering points. It renders the point of no possible value with the jury, and always adds greatly to our labors. We are often compelled to go again and again through a long charge, to see if it covers the respective points. If the practice is continued, and especially if it increases, some of our earlier decisions will have

to be modified, and a more literal compliance with the act of assembly enforced." Attention was again called to this subject in the later case of Duncan v. Sherman, 121 Pa. 520, where it was said by our Brother WILLIAMS: "We also think the points should have been so answered as to leave with the jury a clear idea of the rule by which they were to be guided. The plaintiff's counsel submitted a series of points, ten in number, to which the court made this response: 'So far as the points are in accordance with what we have said to you was the controlling question in the case, they are affirmed, and so far as they are not in accordance with the opinion we expressed in the general charge, they are refused.' It was not necessary to answer specifically every point in this series, but it was necessary to tell the jury the legal rule controlling the questions suggested by the points. We repeat what was said by our Brother PAXSON in Huddleston v. Borough of West Bellevue."

One of the defendant's points was, "that plaintiff, if he recovers at all, must recover on the strength of his own title." We look in vain through the charge for an answer to this point. It was well put, and the defendants had a right to its distinct and unequivocal affirmance. Were there nothing else, we would reverse upon this assignment alone. We give this as a specimen or illustration, however. There are other controlling questions which remain to be considered, and it has been referred to again to emphasize our remarks in these two cases cited. Much as we may regret it, if the practice continues, it will not be long before we shall be compelled to reverse for this reason, and send cases back for re-trial, in order that they may come up in a more regular and orderly manner.

The trust in this case arises under the sixth paragraph of the will of Barnett Gilleland, which is as follows: " To my son William I hereby give and bequeath, in special trust and confidence, as trustee of my daughter Lydia Wallace, the second choice (after my son James), of the above three allotments in Wilkins township, that he will permit the said daughter Lydia to occupy and enjoy the same for her separate use, not to be under the control or subject to the debts of her husband, but to enjoy all the rents, issues and profits, during her natural life, and at her death to descend to the issue of her body, but if the said Lydia should die leaving no issue, then the said es-

tate to revert back, and become part of my residuary estate; the same to be in full of my said daughter Lydia's part, except the bequest hereinafter made out of my residuary estate."

It is not denied that the real estate in controversy is the real estate mentioned in the above paragraph. It appears from the fourteenth paragraph of said will that the trustee had the power to extinguish this trust. It was not done, however, and he is now deceased. Lydia Wallace, the cestui que use of this trust, was a married woman; her husband, James Wallace, was alive at the death of the testator, and still survives. Lydia Wallace died in 1880; one son, James S. Wallace, survived her. Lydia Wallace, supposing her estate in the land to be an estate tail, made two deeds in 1873, for the purpose of barring the entail; one of the deeds was to John W. Wylie, and the other to Thomas J. Jack. The recitals in the deeds declare the purpose to bar the entail. In each case the property was reconveyed to her by the grantee. In neither deed did her husband, James Wallace, or her trustee, join. Having then, as she doubtless supposed, barred the entail, she executed, on May 30, 1873, a mortgage in favor of the Peoples Savings Bank of Pittsburgh, the plaintiffs in this ejectment, for the sum of $10,000, real debt, in which mortgage neither her husband nor her trustee joined. The bank subsequently brought this writ of ejectment on the mortgage, and this is the plaintiff's title.

The titles of the respective defendants arise in various ways. The Woods Run Saving Fund & Loan Association was a creditor of James S. Wallace, the son, and attached the land in controversy as his by proceedings in foreign attachment, obtained a judgment against him for $8,537.51, and sold the land at sheriff's sale, as the property of the said James S. Wallace, to the said Woods Run Saving Fund & Loan Association; the sheriff executed and delivered a deed therefor to said association; the latter entered into possession by virtue thereof, and has continued in possession down to the present time. James Wallace, another of the defendants, claims possession of the premises as tenant by the curtesy, in case his wife, Lydia, took an estate tail. Benjamin F. Wilson, another defendant, defends under the deed of the assignee in bankruptcy of James S. Wallace. His claim is, that said James S. Wallace had a vested re-

mainder under the will aforesaid, and that his interest became absolute upon the death of Lydia Wallace, in 1880. Amelia Gilleland Irwin claims title by virtue of a deed from James S. Wallace executed in May, 1880, and recorded in June, 1885. These outstanding titles are set up by defendants in bar of plaintiff's recovery, so far as any of them show a better title. With this brief reference to the respective claims of the parties, we will now consider the trust referred to, and the effect of the various proceedings in regard to it.

It is not needed that we discuss the estate, if any, which James S. Wallace took under this clause of his grandfather's will. It is clear that said will created a separate use trust in favor of Lydia Wallace for life, with remainder to the issue of her body. The legal title is placed in her brother William; it is hardly probable, though this is not important, in the view we take of the case, that he meant to create an estate-tail, however much the words used would seem to indicate it, for he evidently intended no benefit to his daughter's husband, and an estate-tail would make him a tenant by the curtesy upon the death of his wife. The trust was valid in its creation, and if it had not been executed or avoided in some legal way, prior to the execution of the mortgage to the plaintiff, said mortgage is invalid. In Barnett's App., 46 Pa. 392, overruling Kuhn v. Newman, 26 Pa. 227, it was said by this court: "Amongst the active trusts has always been classed, that to receive and pay over the profits to another, in which case the land must remain in the trustee, to enable him to perform the trust. So, where it is the testator's intention, or where it is necessary for the accomplishment of any object of his will, that the legal estate or possession of the land should remain in the trustee for the purpose of administering the trust. So, also, where the trustee is to dispose of the property, or pay the rents over to the cestui que trust, or apply them to his maintenance, or to make repairs, or to pay annuities, or to manage with the estate as he should think most for the interest of the cestui que trust, or to pay the rents to a married woman, or suffer her to receive them. In all these cases the legal estate does not vest in the cestui que trust, and the use is not executed by the statute in him." This is settled law. There is a long line of cases in this state which hold that the legal estate will remain in the trustee so long as it is nec-

essary to preserve the estate itself, as in a separate use trust for a married woman: Kay v. Scates, 37 Pa. 31; Rife v. Geyer, 59 Pa. 393; Dodson v. Ball, 60 Pa. 492; Thompson v. Carmichael, 122 Pa. 478.

A separate use trust, being only for the protection of the wife during coverture, becomes executed upon the death of her husband: Koenig's App., 57 Pa. 352; Bacon's App., 57 Pa. 504; Dodson v. Ball, 60 Pa. 492: Ogden's App., 70 Pa. 501; and in Koenig's Appeal, supra, this court held that, where a testator gave certain property to a trustee for his daughter, a married woman, and the daughter subsequently obtained a divorce from her husband, that the trust was executed, and she became vested with the legal title.

Lydia Wallace's husband did not die during her life, nor was she divorced from him. It was contended on the trial below, however, that, while the trust was not executed by the death of the husband, or by a divorce, it was nevertheless executed by the desertion of Lydia Wallace by her husband; that by the act of May 4, 1855, P. L. 430, the desertion was the equivalent of a divorce, so far as the control of her property was concerned. The second section of said act declares that " whensoever any husband, from drunkenness, profligacy, or other cause, shall neglect or refuse to provide for his wife, or shall desert her, she shall have all the rights and privileges secured to a feme-sole trader, under the act of 22d of February, 1718, entitled 'An Act concerning feme sole traders,' and be subject as therein provided; and her property, real and personal, howsoever acquired, shall be subject to her free and absolute disposal during life, or by will, without any liability to be interfered with or obtained by such husband, and, in case of her intestacy, shall go to her next of kin as if he were previously dead." The learned judge below took this view of the case, and admitted, against objection on the part of the defendants, a large amount of testimony tending to show cruel and barbarous treatment and desertion on the part of the husband. The trial below turned wholly upon this point, the learned judge saying to the jury (eighteenth specification): " There are some legal questions involved in this case which we will not decide now, as it might possibly interfere with the taking of your verdict upon the questions of fact. We prefer to take your opinion as to

the question of fact raised in the case, and that is whether or not James Wallace neglected or refused to support his wife, Lydia Wallace, or deserted her. The property in controversy was her own, having been bequeathed to her by her father; and the only question in the case for you to determine is, whether or not her husband deserted her, or refused or neglected to support her. If he did, then she had a right to make this mortgage. If he did not, she could not mortgage the property without her husband joining. That is the sole question for you to determine in this case."

I desire to remark, in passing, there are two things to be noticed in this ruling. One is, that it ignores all the grave questions of law in the case growing out of the trust; and the second is, that it leaves the validity of the mortgage to depend upon outside matters, not of record, and which no purchaser or mortgagee would find in the course of any examination of the title, which do not lie in the line of it, and which he could only stumble upon by the merest accident.

It was not pretended that Lydia Wallace had procured a decree from the Court of Common Pleas declaring her a feme-sole trader. It was held, however, in Black v. Tricker, 59 Pa. 13, that it is not necessary, under the act of 1855, that the wife should be decreed a feme-sole trader. That case was well decided, and has been followed since by numerous cases in which the same doctrine is held: see Foreman v. Hosler, 94 Pa. 418; Elsey v. McDaniel, 95 Pa. 472; Ellison v. Anderson, 110 Pa. 486. While these cases are fully warranted by the language of the act of 1855, I desire to express my deep regret that said act permits such a loose practice. Had it required that every married woman, claiming the benefit of the act, should present her petition to the Common Pleas, and there obtain an adjudication or decree establishing the fact of the drunkenness, profligacy, or desertion of her husband, as the case may be, there would be record evidence of the fact, and of her right to deal with her own property as a feme-sole. Now, there is no such record evidence; nothing to warn purchasers, mortgagees, or other persons dealing with her; and no one who takes title from a woman so situated can tell whether his deed is worth the paper it is written upon, until a jury have passed upon the question of her right to deal with her property as a feme-sole. In this

respect the act has worked mischievously in many instances; and we are not disposed to extend it, by implication, to cases which do not fairly come within it.

The proposition that a married woman's separate use trust may be executed or stricken down in this summary way is certainly a novel one. We have no precedent for it in this state, or elsewhere, to my knowledge. If it were to receive the sanction of this court, the consequences might be serious. Separate use trusts are highly beneficial in many instances, if not absolutely essential to the welfare of the cestuis que trustent. It is true, the married woman's act of 1848, as it is called, secures to every married woman the legal control of her own estate. But every one knows that it is not a difficult thing for a husband to wheedle his wife out of her separate estate by his blandishments, or force it from her by his brutality. It is done every day; and this is where the value of a separate use trust comes in, to protect a married woman from her ignorance, her folly, or her overweening confidence in her husband. If such trust may be executed by his desertion, or any of the causes enumerated in the act of of 1855, I see nothing to prevent them from being destroyed by collusion between the wife and her husband. Many cestuis que trustent look upon the trust, however beneficial to them, as an infringement of their rights, and upon their trustee as a natural enemy. If a married woman, she thinks her husband could manage her estate far better than a stranger, and might be quick to collude with him to create such a state of things as would bring them within the act of 1855. As the law now stands, it is not possible for husband and wife to end a separate use trust by collusion. There is no collusion in death, and there should be none in divorce; the law forbids it, and a collusive divorce is no divorce at all. But if the principle contended for here is law, such trusts would have a short lease of life. A colluding couple could soon rid themselves of it. It would only be necessary for the husband to absent himself from his wife for a convenient season; have the trust executed, and then return to his wife; enjoy the use of the trust funds freed and discharged from the trust, and congratulate each other upon having outwitted the law.

Aside from all this, it would be a strained construction of the act of 1855 to hold that when it declares that a married

woman, in the enumerated cases, shall have the right to dispose of her property as a feme sole, it was intended to apply to property held in trust for her benefit. The manifest meaning of it is that, as to such property as constitutes her separate estate —not a trust-estate, of which she has not, and cannot have, the legal title—the marital rights of the husband who has deserted her, etc., shall cease, and she shall be allowed to dispose of such estate as though he were dead, or had never existed. This construction gives full effect to the act; it accomplishes all the good that was intended by it, and avoids the evils which would certainly flow from a different construction of it.

The specifications of error are twenty-two in number. We will not notice them in detail. The case was tried below upon an erroneous theory all the way through. We are of opinion that at the time Lydia Wallace executed the mortgage to the plaintiff the trust was in full force. It follows that the property was not bound, and the mortgage was of no value. She had no power to mortgage or otherwise incumber the estate. For anything that now appears in the case, the defendants were entitled to a binding instruction in their favor.

Judgment reversed, and a venire facias de novo awarded.